## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MEXICALI BORDER CAFE, INC.,

      Plaintiff,

v.                             Case No: 8:21-cv-28-WFJ-CPT

AMGUARD INSURANCE COMPANY,

      Defendant.

_____/

## ORDER

Plaintiff Mexicali Border Cafe Inc. operated a Mexican restaurant that caught fire and was severely burnt. Mexicali filed a claim with its insurance provider, Defendant AmGUARD Insurance Company, to recoup property losses and business income losses. Although Defendant AmGUARD paid part of Mexicali's claim under the insurance policy, Mexicali claims AmGUARD owes it far more money.

Before the Court today is Plaintiff Mexicali's Motion for Partial Summary Judgment. Dkt. 36. Defendant AmGUARD filed a response, Dkt. 45, to which Plaintiff Mexicali replied, Dkt. 48. The parties presented oral arguments during a hearing on January 31, 2022. With the benefit of full briefing and oral arguments, the Court denies Mexicali's motion.

# BACKGROUND

## I.    The Policy

Plaintiff Mexicali's insurance policy with Defendant AmGUARD ("the Policy")[1] contains the following relevant provisions:

### A. Coverage and Disputes

The Policy covers property damage resulting from a fire. Dkt. 56 at 75–77. It also covers losses of business income during the "period of restoration" for a maximum of twelve months from the date of the qualifying event. *Id.* at 80. "Period of restoration" is defined as a period beginning after the physical loss and ending when the premises "should be repaired, rebuilt or replaced with reasonable speed and similar quality," or when the business resumes at a new permanent location. *Id.* at 102–03. The Policy states that Defendant AmGUARD would not pay for increased business income losses resulting from someone's delay in repairing the property. *Id.* at 93.

To resolve disagreements on the loss value, the Policy sets forth the following appraisal provision:

> *If we and you disagree on the amount of loss*, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that

---

[1] The parties filed multiple incomplete, uncertified copies of the Policy throughout the course of this litigation. Dkt. 1-1 at 57–121; Dkt. 36-1; Dkt. 45-2 at 7–71. At oral argument, the Court directed the parties to file a complete, certified copy of the Policy. Defendant AmGUARD did so on February 1, 2022. Dkt. 56. The Court's opinion will refer to this copy of the Policy.

selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

> a.  Pay its chosen appraiser; and

> b.  Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

*Id.* at 94 (emphasis added).

The Policy contains the following restraints on when a policyholder can bring legal action against Defendant AmGUARD. That provision, entitled "Legal Action Against Us," states:

> No one may bring a legal action against us under this insurance unless:

> a.  *There has been full compliance with all of the terms of this insurance*; and

> b.  The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

*Id.* at 95 (emphasis added).

## B.  "Duties In The Event Of Loss Or Damage"

The Policy also includes a section titled "Duties In The Event Of Loss Or Damage," which, unsurprisingly, outlines what policyholders must do in the case of loss. It reads:

> (a)  You must see that the following are done in the event of loss or damage to Covered Property:

(1) Notify the police if a law may have been broken.

(2) Give us prompt notice of the loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when and where the loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limits of Insurance of Section I – Property. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

*(5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.*

(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records. Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

*(7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.*

(8) Cooperate with us in the investigation or settlement of the claim.

*(9) Resume all or part of your "operations" as quickly as possible.*

*Id.* at 94–95 (emphasis added).

## II.    Factual Background

Plaintiff Mexicali is an Oklahoma corporation that operated a Mexican restaurant in Bradenton, Florida. Dkt. 1-1 at 1–2. Mexicali leased the restaurant property from a third party, who appointed a landlord to oversee Mexicali's property needs. *Id.* at 15–51. The restaurant caught fire on October 1, 2017.[2] Dkt. 37 at 3. Mexicali closed the restaurant and suspended its business operations soon after. Dkt. 1-1 at 4.

Pursuant to the Policy, Plaintiff Mexicali filed a claim with Defendant AmGUARD. Mexicali ultimately sought two different types of payments under the Policy coverage: property loss and business income loss. Dkt. 1-1 at 4. AmGUARD assigned employee Mr. William Ardoline to adjust Mexicali's claim. Dkt. 45-2 at 73.

Mr. Ardoline sent Mexicali a letter on November 17, 2017, acknowledging receipt of Mexicali's claim and reminding Mexicali of its post-loss obligations explained in the "Duties In The Event Of Loss Or Damage" section of the Policy. Dkt. 45-2 at 72–73. The letter also stated that AmGUARD had requested the following information from Mexicali but had not yet received it:

> Complete original purchase/installation documentation for all claimed buildouts, equipment, improvements etc.

---

[2] The parties do not dispute that the fire occurred during the Policy period. Dkt. 37 at 2; Dkt. 19 at 2.

> Explanation and documentation for items you purchased and were not in space prior to taking over business
>
> Complete business income documentation

*Id.* at 72. The letter stated that AmGUARD would close the claim if Mexicali failed to provide this documentation within thirty days. *Id.* at 73.

Mr. Ardoline sent Mexicali another letter on behalf of AmGUARD on November 17, 2017. *Id.* at 75. Attached was a pre-populated proof of loss statement that listed $15,000 as an advance for Mexicali's business income loss. *Id.* at 76. Mexicali executed the sworn proof of loss on November 20, 2017, and returned it to AmGUARD. *Id.* at 80.

On January 11, 2018, Mr. Ardoline sent another letter to Mexicali regarding a second advance for business income loss. *Id.* at 78. This time the advance's pre-populated total was $30,000. *Id.* Mexicali executed the sworn proof of loss on January 12, 2018, and returned it to AmGUARD. *Id.* at 77. On March 12, 2018, Mexicali executed a third pre-populated sworn proof of loss for an additional $104,708 for business income loss. *Id.* at 81. Through these three sworn proofs of loss, AmGUARD paid Mexicali a total of $149,708 for its business income loss covering the period of October 1, 2017, to February 28, 2018. Dkt. 55-1 at 2.

Trouble began soon after. AmGUARD sent Mexicali a proof of loss with a pre-populated offer of $70,740 for property loss. *Id.* AmGUARD stated this amount covered "the whole loss and damage." *Id.* Mexicali strongly disagreed with

this valuation. On April 26, 2018, counsel for Mexicali sent AmGUARD a demand letter for $293,954.02 for total property losses, plus an additional $5,000 for legal fees. *Id.* at 2–4. The attorney also stated that Mexicali's business income loss was still ongoing, and that Mexicali would be submitting business income loss reports for the months of March and April. *Id.* at 2. The letter partially blamed the property's owner/landlord for the continued business income losses, stating: "To date, almost a full seven months after the fire, the owner/landlord of the Property has yet to complete (or, to our knowledge, even begin) the necessary work to restore the Property." *Id.* Attached to this letter was a property loss matrix. *Id.* at 2; Dkt. 45-2 at 84–87. Mexicali argues this matrix and the corresponding documentation supported its property loss claim of $293,954.02. Dkt. 55-1 at 4. But Defendant AmGUARD argues this matrix included line items not compensable under the Policy, including advertisements, items lost in a storm, estimates for uncovered "planning," handwritten documents that have no value, air travel receipts, and items that were not in the business at the time of the fire. Dkt. 46 at 3.

On April 30, 2018, Mexicali sent AmGUARD a sworn proof of loss with handwritten edits crossing out the pre-populated totals for each loss category. Dkt. 45-2 at 82. Attached to the sworn proof of loss was an addendum supporting

Mexicali's loss calculations from the April 26th letter, as well as hundreds of pages of documentation outlining the properties Mexicali says it lost in the fire. *Id.* at 83.

On May 18, 2018, Mr. Ardoline emailed Mexicali's attorney saying that AmGUARD rejected the edited proof of loss for the following reasons: "1) The document itself is unreadable, 2) The number claimed for payment is unsupported to date, 3) It is edited from the original version sent to the insured, with multiple scratch outs and pen marks." Dkt. 36-3. Mr. Ardoline further stated that AmGUARD rejected Mexicali's claim for additional business loss income. *Id.* Mr. Ardoline based this rejection on the following reasons:

> 1) To date the insured hasn't supported that they will be going back to business at this location. He originally indicated he would close up shop and return to his business in Oklahoma and not re-open in Florida.
>
> 2) The repairs have yet to begin to the building because of the landlord's lack of cooperation. The policy that is in force between Mexicali Border Café, Inc. and AmGUARD insurance doesn't respond to delays caused by the landlord.

*Id.*

Mexicali's attorney replied to this email on June 13, 2018, with another letter. Dkt. 55-2. The attorney took issue with Mr. Ardoline's reasons for rejecting Mexicali's April 30th loss statement. First, the attorney pointed out that Mr. Ardoline rejected the proof of loss as "unreadable," yet Mr. Ardoline was able to determine the content and amount claimed. *Id.* at 2. Second, the attorney argued that Mexicali had submitted documentation supporting "every item of personal

property claimed and every item of building damage claimed," and that Mr.

Ardoline should identify which claimed items he believed were unsupported. *Id.*

Third, the attorney questioned why Mexicali was being forced to execute a proof

of loss with pre-populated loss amounts unilaterally determined by AmGUARD.

*Id.* He argued Mexicali should be free to annotate and amend the proof of loss to

reflect the loss amounts Mexicali was claiming. *Id.* Fourth, the attorney argued

Mexicali is entitled to ongoing business income loss, rejecting Mr. Ardoline's

claim that Mexicali's owner did not intend to reopen the Bradenton location. *Id.* at

2–3. Finally, the attorney argued Mexicali was entitled to coverage for damages to

the improvements/alterations it made to the property. *Id.* at 3.

AmGUARD did not respond to this correspondence for several months,

despite Mexicali's counsel calling Mr. Ardoline multiple times. Dkt. 1-1 at 141. In

a letter dated August 28, 2018, Mexicali's counsel stated that if they did not hear

from AmGUARD by August 30, 2018, Mexicali would exercise its right to an

appraisal under the Policy and file a complaint with the Florida Insurance

Commission regarding AmGUARD's lack of communication. *Id.*

Mr. Ardoline responded via email on September 7, 2018, requesting

Mexicali to "outline in detail your questions on the claim so they can be reviewed

and advised upon." *Id.* at 142. Mexicali's counsel responded on September 10,

2017, asking AmGUARD to break down its offer of $70,740.21 for building damage loss. *Id.* at 144.

Four days later, on September 14th, Mexicali's counsel again emailed Mr. Ardoline, chastising him for his lack of communication. Mexicali stated that it was formally exercising its right to an appraisal under the Policy, escalating the dispute to Mr. Ardoline's supervisor at AmGUARD, and submiting a complaint with the Florida Insurance Commission. *Id.* at 143.

Mr. Ardoline responded the same day. *Id.* at 149. He stated: "the insured has failed to return a proof of loss which has been requested multiple times, leaving $almost [sic] $71,000.00 on the table. If returned properly executed they have the opportunity to receive over $200,000 since they have previously been paid $149.708.00." *Id.*

Mexicali's counsel responded minutes later, saying: "We have repeatedly sent a proof of loss that you fail to accept. You are instead trying to force Mexicali to sign a proof of loss that you prepared without providing any explanation as to the basis for the figures . . . My client is not obligated to execute and attest to a form that he did not complete." *Id.* at 148–49.

Mr. Ardoline responded shortly after, attaching a worksheet "outlining what the insured has supported to date through invoices." *Id.* at 148. He said: "If they

wish to be reimbursed for anything further they need to provide the supporting invoices for additional items per policy conditions." *Id.*

Mexicali's counsel emailed a response on October 30, 2018. *Id.* at 146–47. The attorney noted that Mr. Ardoline had attached a worksheet dated February 13, 2018, which did not include the additional items claimed by Mexicali in its April 26th and June 13th correspondence. *Id.* at 147. The attorney also stated that Mr. Ardoline's worksheet significantly undervalued several claimed items, for which Mexicali had provided supporting documentation. The attorney stated: "The fact that you have overlooked these additional letters from [Mexicali's counsel] is further evidence of your repeated failure to cooperate and adjust in a reasonable and timely manner under the policy." *Id.* The attorney then repeated Mexicali's demand for an appraisal. *Id.*

Mr. Ardoline emailed a response on November 2, 2018, disputing the value of the damaged items and inquiring whether Mexicali provided sufficient documentation to support its claimed damages. *Id.* at 146. Responding to Mexicali's appraisal demand, Mr. Ardoline said: "Due to the above questions and the fact that we are not refusing payment, we are just requiring further support, we will not be going to appraisal at this time." *Id.* Mr. Ardoline said that if Mexicali executed the proof of loss pre-populated with the $70,740.21 offer, AmGUARD would consider that amount undisputed and pay it out. *Id.*

11

Mexicali hired a public adjuster to prepare a valuation report. Dkt. 37 at 6. On August 14, 2019, Mexicali sent AmGUARD a copy of this valuation report, as well as an updated sworn proof of loss. Dkt. 1-1 at 210–27. Mexicali demanded that AmGUARD pay it $544,079.20 to "fully resolve this claim." *Id.* at 210.

Later that day, Mr. Ardoline sent an email rejecting Mexicali's latest proof of loss on the basis that Mexicali had not supplied the requested supporting documentation. Dkt. 36-12. Mr. Ardoline stated that "no further consideration will be made beyond what has been paid per supporting documents." *Id.*

To date, AmGUARD has paid Mexicali $149,708 for business income loss covering the period of October 1, 2017, to February 28, 2018. Dkt. 47 at 3. AmGUARD has paid Mexicali nothing for property loss. *Id.* Mexicali claims its total losses are $663,817.20. Dkt. 1-1 at 4.

The restaurant has remained closed since the fire. Mexicali claims: "As a direct result of the Insurer's failure to pay, coupled with the owner/landlord's failure to conduct necessary work to repair the Property, Mexicali was unable to resume its business and forced to close its Bradenton, Florida location." Dkt. 1-1 at 5.

### III.   Claims In This Lawsuit

Plaintiff Mexicali brings two claims against Defendant AmGUARD. First, Mexicali alleges AmGUARD breached the Policy by failing to pay the insurance

proceeds due to it. Dkt. 1-1 at 11–12. Second, Mexicali asserts AmGUARD acted in bad faith by failing to investigate its claim and failing to pay the losses covered under the Policy. *Id.* at 12–13. This claim is brought pursuant to Fla. Stat. § 624.155. The Court abated the bad-faith claim in March 2021, directing the parties to litigate this claim pending resolution of the breach-of-contract claim. Dkt. 28. Pursuant to this directive, Plaintiff Mexicali now seeks summary judgment on the breach-of-contract claim only.

## LEGAL STANDARDS

Summary judgment should be entered only if there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; it must be a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* at 248.

If factual issues are present and they are material, the Court must deny the motion and proceed to trial. *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir. 1990).

## ANALYSIS

### I.     The Appraisal Provision

The Court first addresses the appraisal provision in the Policy. Although Plaintiff Mexicali has not explicitly requested an order compelling appraisal, many of its arguments imply it would desire such.

Mexicali demanded appraisal two times: once in an email sent to Mr. Ardoline on September 14, 2018, Dkt. 36-6, and again in another email to Mr. Ardoline on October 30, 2018. Dkt. 36-7 at 2. Mr. Ardoline replied to the latter demand on November 2, 2018, stating in an email: "Due to [questions about the claimed losses] and the fact that we are not refusing payment, we are just requiring further support, we will not be going to appraisal at this time." *Id.* at 1.

At oral argument, Defendant AmGUARD reiterated Mr. Ardoline's position, arguing it was not required to engage in the appraisal process because the Policy's appraisal provision applies only when the parties "disagree on the amount of loss." According to AmGUARD, the parties were disputing the scope of what items Mexicali could claim as losses—not the loss amount itself.

Although skeptical of this argument,[3] the Court ultimately need not address it. There is a separate reason why appraisal cannot be compelled here: there are questions of material fact as to whether Plaintiff Mexicali satisfied all its post-loss obligations under the Policy.

Pursuant to Florida law, an insured must satisfy all its post-loss obligations before a trial court can compel appraisal. *See State Farm Fla. Ins. Co. v. Cardelles*, 159 So. 3d 239, 241 (Fla. 3d DCA 2015) (stating that "all post-loss obligations [must] be satisfied before the trial court can properly exercise its discretion to compel appraisal"); *see also Jacobs v. Nationwide Mut. Fir Ins. Co.*, 236 F.3d 1282, 1285–86 (11th Cir. 2001) (reversing trial court's appraisal order because insured failed to satisfy all post-loss obligations). In the context of compelling appraisal, substantial compliance is not enough. Only full compliance with all post-loss obligations can trigger appraisal. *See Cardelles*, 159 So. 3d at 241 (rejecting notion that "something less than full compliance with all post-loss obligations" can trigger appraisal).

Here, Defendant AmGUARD argues Mexicali violated three of its post-loss obligations: (1) providing AmGUARD complete inventories of the damaged and

---

[3] *See, e.g.*, *Cole v. Owners Ins. Co.*, 326 F. Supp. 3d 1307, 1325 (N.D. Ala. 2018) (analyzing the same argument advanced here by Defendant AmGUARD and stating: "[T]he parties agree that a fire occurred and that things damaged by the fire would be covered under the Policy. [The parties], therefore, only disagree about the extent and value of the loss. That subject is primed for appraisal.").

undamaged property; (2) resuming all or part of its operations as quickly as possible; and (3) timely submitting a signed, sworn proof of loss.

The Court will first address the alleged documentation deficiencies. The Policy provides that, at AmGUARD's request, Mexicali must give "complete inventories of the damaged and undamaged property . . . [including] quantities, costs, values and amount of loss claimed." Dkt. 56 at 95. AmGUARD says it repeatedly requested specific documentation from Mexicali, but Mexicali continually failed to submit the documentation needed to support its claimed losses. Dkt. 45 at 2. And when Mexicali did submit documentation, AmGUARD argues, it included items that were not covered under the Policy, such as advertisements, items lost in a storm, estimates for uncovered "planning," handwritten documents that have no value, air travel receipts, and items that were not in the business at the time of the fire. *Id.* at 2, 4. Moreover, AmGUARD contends Mexicali failed to report how much it recouped during an undocumented going-out-of-business sale. *Id.* at 4–5. AmGUARD says Mexicali has provided "zero evidence of what items were sold or for how much." *Id.* at 5.

The Court holds that there are genuine questions of material fact as to whether Mexicali fulfilled this post-loss obligation. Although Mexicali submitted hundreds of pages supporting its claimed losses, the parties dispute whether these documents provide the specific support required under the Policy. Dkt. 45-2 at 81–

252. Mexicali says the documents were sufficient and that it made numerous attempts to contact AmGUARD to provide updated information on its claim. Dkt. 36 at 15–17. AmGUARD says the documents omitted key information and included items not covered under the Policy. Dkt. 45 at 3 –5. This factual dispute prevents the Court from compelling appraisal. *See Fla. Gaming Corp. v. Affiliated FM Ins. Co.*, 502 F. Supp. 2d 1257, 1264 (S.D. Fla. 2007) (holding there was a genuine dispute of material fact as to whether insured submitted all documention in accordance with post-loss obligations, despite insured producing hundreds of pages of documents); *see also Jacobs*, 236 F.3d at 1285–86 (holding there were questions of material fact as to whether insured fulfilled post-loss duties by responding to some, but not all, of insurer's questions and document requests).

Second, Defendant AmGUARD argues there is a material factual dispute as to whether Mexicali failed to reopen its business within a reasonable build-back period. Dkt. 45 at 5–6. Under the Policy, Mexicali has a post-loss obligation to "[r]esume all or part of [its] 'operations' as quickly as possible." Dkt. 56 at 95. The Policy also provides coverage for business income losses only during "the period of restoration," which is defined as a reasonable amount of time to repair the business. *Id.* at 80, 93, 102–03. AmGUARD contends Mexicali violated these provisions by allowing its landlord to delay repairing the building. Dkt. 45 at 5–6 (citing Dkt. 1-1 at 5).

The Court again agrees with Defendant AmGUARD. The question of what constitutes a "reasonable" build-back period is a factual determination that cannot be resolved on a motion for summary judgment. This determination relies on several disputed facts, such as the extent of the property's fire damage, the extent and cost of the repairs, and whether the landlord's actions delayed the rebuilding process. Such factual inquiries prevent this Court from determining whether Mexicali satisfied this post-loss obligation, thereby preventing an order compelling appraisal.

Finally, Defendant AmGUARD argues Plaintiff Mexicali missed its deadline for submitting a sworn proof of loss. The Policy sets forth the following post-loss obligation for Mexicali: "Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms."  Dkt. 56 at 95. According to AmGUARD, Mexicali submitted its sworn proof of loss over a month and a half late. Dkt. 45 at 4.

As an initial note, there appears to be some confusion among the parties as to the deadline for submitting the sworn proof of loss. Defendant AmGUARD claims the deadline was March 12, 2018. *Id.* ("Rather than submit a Signed Proof of Loss within 60 days of its requests, *which would have been on March 12, 2018,* the Plaintiff chose to wait until April 30, 2018, to submit a 'SPOL.'") (emphasis

18

added).[4] But the record shows this is incorrect. Mr. Ardoline sent Plaintiff Mexicali the applicable proof of loss on February 28, 2018.[5] Dkt. 1-1 at 122. This means Mexicali's deadline was April 29, 2018. Mexicali submitted the applicable sworn proof of loss on April 30, 2018. Dkt. 36 at 15–16; Dkt. 19 at 6.

Although Plaintiff Mexicali missed the deadline by one day, the Court declines to rely on this technical violation in reaching its holding. The other two post-loss obligations at issue here—the duty to submit sufficient documentation and the duty to resume operations as quickly as possible—present a sufficient basis for holding that there are genuine disputes of material fact as to whether Plaintiff Mexicali satisfied all its post-loss obligations. These factual disputes prevent the Court from compelling appraisal. *See Jacobs*, 236 F.3d at 1285–86 (holding that Florida law requires an insured to fulfill all post-loss obligations before appraisal is triggered).

## II.   Plaintiff Mexicali's Motion for Summary Judgment.

In its Motion for Summary Judgment, Plaintiff Mexicali reduces this dispute to its simplest form. It argues it is entitled to summary judgment because the

---

[4] It seems like Defendant AmGUARD based its calculations on the sworn proof of loss Mr. Ardoline sent Mexicali on January 11, 2018. Dkt. 45-2 at 78. But this proof of loss—one of many sent by AmGUARD to Mexicali during the claims adjusting process—is not the one in dispute here.

[5] The record does not contain this specific correspondence between Mr. Ardoline and Plaintiff Mexicali. The Court bases its deadline calculations on Mr. Ardoline's email stating that he sent the proof of loss at issue here on February 18, 2018. Dkt. 1-1 at 122.

parties had a valid insurance contract, Defendant AmGUARD breached this

contract by refusing to pay the total losses claimed by Mexicali, and such breach

damaged Mexicali. Dkt. 36 at 6. But this dispute is not as simple as Mexicali

contends.

An insured's post-loss obligations may constitute conditions precedent to a

lawsuit against the insurer. *See Lopez v. Avatar Prop. & Cas. Ins. Co.*, 313 So. 3d

230, 235 (Fla. 5th DCA 2021) (quoting *Bryant v. GeoVera Specialty Ins. Co.*, 271

So. 3d 1013, 1021 (Fla. 4th DCA 2019)). If the insured materially breaches its duty

to comply with a condition precedent in the insurance policy, the insurer may be

relieved of its policy obligations.[6] *Starling v. Allstate Floridian Ins. Co.*, 956 So.

2d 511, 513 (Fla. 5th DCA 2007). If, however, the insured cooperates to some

degree or provides an explanation for its noncompliance, a question of fact is

presented for resolution by a jury. *Haiman v. Fed. Ins. Co.*, 798 So. 2d 811, 812

(Fla. 4th DCA 2001) (citing *Diamonds & Denims, Inc. v. First of Ga. Ins. Co.*, 203

---

[6] Normally, this type of inquiry would be addressed on a motion for summary judgment filed by the *insurer*. The insurer would argue the insured forfeited coverage through its failure to comply with its post-loss obligations. *See, e.g.*, *Arguello v. People's Trust Ins. Co.*, 315 So. 3d 25, 37 (Fla. 4th DCA 2021) ("[I]nsurer filed a motion for final summary judgment, arguing that because insureds had failed to comply with the policy loss provisions within sixty days, they had breached the policy and insurer was entitled to a judgment forfeiting coverage."); *Edwards v. SafePoint Ins. Co.*, 318 So. 3d 13, 16 (Fla. 4th DCA 2021) (describing insurer's summary judgment argument that the policy was ineffective because insured failed to satisfy post-loss obligations). Here, however, Defendant AmGUARD did not file its own motion for summary judgment. It instead simply responded to Plaintiff Mexicali's motion, arguing Plaintiff Mexicali is not entitled to summary judgment because it did not satisfy its post-loss obligations.

Ga. App. 681, 417 S.E.2d 440, 441–42 (1992)). Whether an insurer is prejudiced

by an insured's untimely compliance is also a question of fact. *Arguello v. People's*

*Tr. Ins. Co.*, 315 So. 3d 35, 41 (Fla. 4th DCA  2021); *see also Kramer v. State*

*Farm Fla. Ins. Co*., 95 So. 3d 303, 306 (Fla. 4th DCA 2012).

The Court must first assess whether Mexicali's post-loss obligations in

the "Duties In The Event Of Loss Or Damage" section of the Policy constitute

conditions precedent to coverage. The Court holds that they do. The Policy states

that Plaintiff Mexicali cannot bring legal action against Defendant AmGUARD

regarding the Policy unless "[t]here has been full compliance with all of the terms

of this insurance." Dkt. 56 at 95. The "Duties In The Event Of Loss Or Damage"

section states that Plaintiff Mexicali "*must* see that the following [post-loss

obligations] are done in the event of loss or damage to Covered Property." *Id.* at 94

(emphasis added). The combination of these Policy provisions creates a condition

precedent to a suit brought by Mexicali against AmGUARD. *See Am. Integrity Ins.*

*Co. v. Estrada*, 276 So. 3d 905, 911 (Fla. 3rd DCA 2019) (holding that policy

language substantially similar to the instant Policy created a condition precedent to

insured's suit against insurer); *see also Arguello*, 315 So. 3d at 41–42 (holding that

the following policy provision created a condition precedent to a suit by the

insured against the insurer: "[no] action can be brought unless the policy

provisions have been complied with").

21

Having determined that these post-loss obligations are conditions precedent, the Court must now address whether Plaintiff Mexicali complied with them. The Court holds that this determination relies on several disputes of material fact that must be resolved by a jury. First, as analyzed above, there are factual questions as to whether Plaintiff Mexicali satisfied all its post-loss obligations. If Plaintiff Mexicali breached these obligations, then Defendant AmGUARD may be relieved of its duties under the Policy. *See Starling*, 956 So. 2d at 513. Second, it is a factual determination whether Plaintiff Mexicali's alleged noncompliance amounts to a material breach of the Policy. Plaintiff Mexicali cooperated to some degree by submitting a sworn proof of loss (albeit a day late) and providing documentation to support its claimed losses. It is a question of fact whether Plaintiff Mexicali substantially complied[7] with its post-loss obligations, or whether its alleged deficiencies materially breached the Policy. *See Haiman*, 798 So. 2d at 812; *see also Solano v. State Farm Fla. Ins. Co.*, 155 So. 3d 367, 370 (Fla. 4th DCA 2014) ("[W]here an insured cooperates to some extent, a fact question remains as to

---

[7] Substantial compliance is a defense for insureds when the court is determining whether the insured's noncompliance with post-loss obligations precludes its ability to recover from the insurer. *See Edwards*, 318 So. 3d at 17–18 (discussing substantial compliance defense in the context of determining whether noncompliance with post-loss obligations was a material breach that rendered the policy ineffective). Substantial compliance is not a defense for insureds, however, when the court is determining whether the insured's noncompliance with post-loss obligations prevents an order compelling appraisal. *See Cardelles*, 159 So. 3d at 241. This difference in approach is likely attributed to the fact that Florida law disfavors the forfeiture of insurance coverage. *Boca Raton Cmty. Hosp., Inc. v. Brucker*, 695 So. 2d 911, 912 (Fla. 4th DCA 1997).

whether the condition is breached to the extent of denying the insured any recovery under the policy."). Finally, it is a factual determination whether Defendant AmGUARD was prejudiced by Mexicali's alleged noncompliance. *See Arguello*, 315 So. 3d at 41. These factual disputes prevent the Court from granting Plaintiff Mexicali summary judgment.

### III.   Abatement of the Bad-Faith Claim

Because this matter is going to a jury trial, the Court sees no need to continue the abatement of the bad-faith claim, Count II. As explained below, there is no sound reason to freeze or abate Count II in this case.

Courts may abate bad-faith claims when coverage is disputed. But here, there is no coverage dispute. In fact, Defendant AmGUARD already made partial payment pursuant to the Policy's coverage.

Courts may also abate bad-faith claims when the claims are not colorable, sufficiently ripe, or definite enough. Oftentimes parties need to use the underlying coverage case to "flesh out" the insured's allegations that the insurer engaged in improper claims handling or unfair claims adjusting. But here, the record contains several facts showing Plaintiff Mexicali has a colorable claim that Defendant AmGUARD engaged in a questionable claims handling process. The Court summarizes such facts below.

In one example, the prime adjuster informed his supervisor in an internal email on August 13, 2018, that Plaintiff's claim had been closed because the "insured never responded to the attached email multiple times." But the record does not support this assertion. On September 14, 2018, after complaining (again) about the adjuster's non-responsiveness, Plaintiff invoked a written demand for appraisal. Dkt. 36-10 at 2. When asked why the appraisal demand (first made on September 14th) was refused, Defendant AmGUARD stated in an interrogatory: "Adjustment of the claim was still ongoing and pending additional information requested by the Defendant[.]" Dkt. 36-13 at 12. The Court is unable to reconcile how the claim was supposedly closed in mid-August for lack of communication, yet the adjustment of the claim was "still ongoing and pending" in mid-September. Although there may be an explanation for this inconsistency, it presently eludes the Court.

Further, Plaintiff makes a colorable argument that rehabilitative construction for a fire of this size requires more than only five months' loss of business income. Indeed, Defendant AmGUARD's own expert—who was stricken for tardy filing— suggested that a lengthier period of repair was required. Dkt. 45-4 at 2.

Another example is Defendant's simple inability to produce the Policy. The Claims Manager filed an affidavit dated January 21, 2022, in which she asserted personal knowledge of the operable policy, but then she provided the Court the

incomplete or wrong policy. Dkt. 45-2 at 2. In reliance on this, Defendant's

counsel cited to the incomplete policy in his summary judgment papers. After

spending quite some time searching, the Court discovered that most of the key

provisions in this case were missing from this submitted policy, including the 60-

day proof of loss requirement, the limitation on rebuild period, and the appraisal

term. Defendant AmGUARD then submitted a different or corrected policy after

the Court called the parties' attention to these inconsistencies. Likewise, the policy

attached to Plaintiff's complaint (which Plaintiff says it received from Defendant)

was incomplete. And in a key letter dated November 17, 2017, Defendant's

adjuster cites and cautions Plaintiff about a dispositive coverage form in the policy,

but he miscites the form number. In fact, the form number he cites cannot be found

in this record, and the form number corresponded to a policy not even used in

Florida.

Considering the above, the Court holds that Count II is not frivolous and it

therefore may proceed. Whether Plaintiff can prove this claim remains to be seen.

The Court will bifurcate the jury trial to permit Count I to be tried first. If the jury

finds liability on Count I, the parties will then present Count II to the same jury.

Accordingly, the case management order is amended as follows: The pretrial

conference set for March 10, 2022, is continued. The matter is removed from the

present trial setting and will be set for trial on the November 2022 calendar on both

counts (unless Count II is disposed of by dispositive motion). The Court has determined that Count II states a claim for relief; thus Defendant will file an answer and its defenses to Count II within ten days. Discovery may commence at this time on Count II. Any expert designation as to Count II by Plaintiff must comply with all federal procedural rules and is due no later than July 1, 2022 (with defense designation due by July 14, 2022). Discovery cut-off as to Count II is August 15, 2022. The deadline for dispositive motions is August 20, 2022, including any motions related to punitive damages. Responses to any dispositive motions are due fourteen days thereafter. The Court sets a final pretrial conference on October 5, 2022, at 4:00 p.m.  If the parties wish to attend the pretrial conference by telephone, kindly file a motion. Due to the age of this case (and that a lot of discovery has already occurred), the Court does not expect to extend these deadlines.

## CONCLUSION

The Court **DENIES** Plaintiff Mexicali's Motion for Partial Summary Judgment, Dkt. 36.

**DONE AND ORDERED** at Tampa, Florida, on March 7, 2022.


*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

26

**<u>COPIES FURNISHED TO:</u>**
Counsel of Record